## Page 129

(Document marked as requested.)

MR. OGUS: Q Okay. Exhibit 1 is the class C misdemeanor complaint, People of the State of Illinois versus Robert L. Felder, stamped 071260764.

Do you see that? Do you have that in front of you?

THE WITNESS: A Yes.

Q And looking halfway through the page where it says complainant's signature, is that your signature?

A No.

Q Do you know who signed it?

A No.

Q And going further down where it says complainant's signature, above judge or clerk of court, two lines above that, do you see that signature?

A Yes.

Q And it says C. Bady. Do you see that?

A Yes.

## Page 130

Q Is that your signature?

A No.

Q So neither of the two signatures that say C. Bady on this complaint are in fact signed by you, correct?

A No.

Q No, that's not correct or yes, that's correct?

A No, that's correct. It's not signed by me.

Q Did you authorize anyone to sign your name for you?

A Yes, I did.

Q And who was that?

A The team.

Q Anyone from the team?

A Anyone from the team.

Q Do you know who signed that for you?

A No, I don't.

Q So it could have been someone who wasn't even at the scene of the incident who signed this?

A No.

Q How many people -- how many members

## Page 131

of the team were at the scene?

A The team was there.

Q How many members of them?

A Ten.

Q Ten?

A Ten members on a team.

Q So all ten of you were there?

A No. I mean -- you can look at the arrest report to see who all was there.

Q I'm asking you how many were there.

A I can't recall --

Q Okay.

A -- How many was there.

Q Do you know -- can you name for me specifically the people who were there?

A I mentioned Sergeant Holt.

Q Okay.

A And my partner.

Q Meaning -- who's your partner?

A Charlie Johnson.

Q Okay. Who else was there?

A The information is on the arrest report. I cannot recall.

Q Okay. Then that's the answer. I

## Page 132

can't recall is the answer.

A I said that already.

Q Okay. I want to to know now what you mean now as you are sitting here -- as you sit here today, the only two people that you remember being part of the team at the arrest of Mr. Felder were Sergeant Holt and Charlie Johnson; correct?

A Yes.

Q And what were Charlie Johnson's duties that day as part of the team?

MR. SELMER: Objection. Speculation, foundation.

THE WITNESS: A I can't tell you what Charlie Johnson's duties were, but he was there.

MR. OGUS: Q Let's talk about the arrest of Mr. Felder. Did he have specific duties as to the arrest Mr. Felder?

MR. SELMER: Same objections.

THE WITNESS: A I can't tell you what his duties were.

MR. OGUS: Q Do you know what Sergeant Holt's duties were?

MR. SELMER: Same objections.

THE WITNESS: A I can't tell you what his

**Page 133**

duties are.

MR. OGUS: Q So you have no idea what they did with regard to the arrest of Mr. Felder? You have no idea what either one of those two individuals did?

A Those two individuals can answer that question for you. I can't answer that question for them.

Q I'm asking you to listen to me...

A As a team there's a mission.

Q I don't want to know the team's mission -- well, okay. What was the team's mission?

I do want to know the mission. Thank you.

A To address the prostitution complaints on Exchange.

Q And I'm asking you what you know. I will ask perhaps Mr. Johnson and perhaps Sergeant Holt when their day comes, but I'm asking you right now what you know.

That's all I'm asking, what you know. If you don't know, you don't know; and we can move on. But if you know, I'd like to find

**Page 134**

out what you know.

As to Sergeant Holt do you know anything he did concerning the arrest and detention of Mr. Felder?

A No, I don't know.

Q Okay. And as to Charlie Johnson do you know anything he did as to the arrest of Mr. Felder?

A You can ask Charlie Johnson.

Q No, no. I'm asking you. I'm asking you.

A He was there. He -- he was an officer -- I mean, he was involved in the mission.

Q What was his involvement in the mission?

A He would have to tell you.

Q I'm asking you.

A I don't know.

MR. SELMER: The question is as to Mr. Johnson.

MR. OGUS: Q She's answered it. She's answered it.

So you don't know any single thing Mr. Johnson did regarding...

**Page 135**

THE WITNESS: A He was enforcement.

Q What does that mean?

A He was a take-down officer.

Q What does a take-down officer do?

A He responds to my signal.

Q So now you're telling me that Mr. Johnson was the person who responded to your signal, correct?

A Yes.

Q And you know that, correct?

A Yes.

Q So you know that Mr. Johnson was involved in the detention and arrest of Mr. Felder, correct?

A Yes.

Q Okay.

Did Mr. Holt -- did Sergeant Holt have any duties in the arrest Mr. Felder?

MR. SELMER: Objection. Speculation, foundation.

THE WITNESS: A Once again, the arrest report clearly states who's involved.

MR. OGUS: Q Okay. I know what it clearly states.

**Page 136**

A As far as his duties, I don't know.

Q But you knew about Mr. Johnson's, right?

A Yeah.

Q And I'm asking do you know what Mr. Holt's duties were, yes or no.

A I don't know his duties, but he was there.

Q Okay.

A He was involved.

Q I know he was -- you told me he was there. You told me he was involved in the mission to eradicate prostitution from this area. And I want to know as to Mr. Felder if you know what his specific involvement was with the arrest or detention of Mr. Felder. Either you know or you don't know.

A No, I don't know.

Q That's the end of the question.

Okay. Now did anybody tell you that they signed this criminal complaint for you, the one -- Exhibit 1 that's in front of you. It's still in front of you. It has your name on it -- by the way, you are star number 11453; right?

Page 137

1 A Yes.
2 Q Did you type any of the information
3 on here?
4 A No.
5 Q The information that's written about
6 Mr. Felder at the top, did you write any of that
7 information on here?
8 A No.
9 Q Do you know who did?
10 A No.
11 Q Let's look at the charges in the
12 middle where it says committed the offense -- Mr.
13 Felder committed the offense of prostitution,
14 soliciting for -- it's spelled wrong, but let's
15 call it the word "business".
16        Okay. Do you see that word?
17 A Um-hum.
18 Q And the allegation is that he/she did
19 solicit for prostitution upon the public way. ROs
20 witnessed about subject solicit police decoy by
21 stating he would give her $10 U.S.C. for oral sex.
22        Do you see that?
23 A Yes.
24 Q Is that a fair statement of what

Page 138

1 occurred?
2 A Yes.
3 Q That's a true statement of what
4 occurred -- rather, it's a true statement of what
5 you say Mr. Felder did; correct?
6 A Yes.
7 Q Now you're saying that Mr. Felder
8 offered you $10 for oral sex, right?
9 A He agreed to $10, to give me $10.
10 Q He agreed to it?
11 A Yes.
12 Q He agreed to give you $10 for oral
13 sex?
14 A Yes.
15 Q So you asked him will you give me $10
16 for oral sex?
17 A He agreed to give me $10 for oral
18 sex.
19 Q How did he know he was giving you $10
20 for oral sex if he agreed to it?
21 A Because he agreed and he showed me
22 the money.
23 Q How did -- I understand the money
24 part of it, that he showed you $10. How did he

Page 139

1 know you were talking -- you were talking about
2 oral sex?
3 A Because I said it.
4 Q Let's go to that. You said to Mr.
5 Felder -- before he mentioned anything about sex
6 you said to him give me $10 and I'll give you oral
7 sex, or words to that effect?
8 A There was an offer of oral sex --
9 Q From whom?
10 A -- And he agreed.
11 Q The offer was from you?
12 A I'm sorry?
13 Q The offer was from you?
14 A Yes.
15 Q So you're the first person who
16 mentioned oral sex?
17 A Yes.
18 Q Now it says here -- in the middle of
19 that paragraph that I read, it says ROs. Do you
20 see -- there's RO and an apostrophe and then an S,
21 ROs. Do you see that?
22 A Yes, I see it.
23 Q Do you know whether anyone else told
24 you -- well did anyone else tell you that they

Page 140

1 heard the conversation between you and Mr. Felder?
2 A No, no one told me.
3 Q So it should be really that the
4 reporting officer, only one of them, witnessed the
5 solicitation; correct?
6   MR. SELMER: Objection. Foundation,
7 speculation.
8   MR. OGUS: Can you read the question again.
9
10        (Question read.)
11
12   THE WITNESS: A ROs witnessed.
13   MR. OGUS: Q It should be RO, not ROs;
14 right?
15   MR. SELMER: Same objection.
16   THE WITNESS: A I'm sorry?
17   MR. OGUS: Q It should be RO, not RO
18 apostrophe S, making it plural. Do you understand
19 the difference?
20 A I understand the difference.
21 Q Let's go back to the question.
22        Do you know of more than one
23 person, meaning you, who witnessed or told you
24 that they heard this $10 for oral sex?

Page 141

1  A  No.
2  Q  Okay.
3  A  It was just me. As far as I know I'm
4  the only person that witnessed it.
5  Q  So that's a mistake when that S is
6  entered, correct, as far as you know?
7  MR. SELMER: Objection. Foundation,
8  speculation.
9  THE WITNESS: A I don't know.
10  MR. OGUS: Q As you're reading it today,
11  as far as you know today, is it a mistake or not?
12  A  I can't say it's a mistake. All I
13  know is I'm the RO, the witness.
14  Q  I'll ask it one more time. Did
15  anyone tell you that they heard or witnessed the
16  $10 for oral sex?
17  A  Did anyone -- no, no one else told me
18  that.
19  Q  Okay.
20      And where it says in the third
21  line police decoy -- do you see that in the body
22  of the offense?
23  A  Um-hum -- yes, I see it.
24  Q  That's you? We're talking about you

Page 142

1  there, correct?
2  MR. SELMER: Objection. Foundation,
3  speculation.
4  MR. OGUS: Q That's you, right? You're
5  the police decoy?
6  MR. SELMER: Same objections.
7  THE WITNESS: A What -- what are you
8  asking?
9  MR. OGUS: Q Are you the police decoy?
10      I'm asking it in English. Are
11  you the police decoy?
12  MR. SELMER: Same objections.
13  THE WITNESS: A I'm undercover.
14  MR. OGUS: Q Do you see the complaint that
15  says police decoy?
16  A  Yes.
17  Q  Are they referring to you, as far as
18  you know?
19  A  I don't know. I'm not them.
20  Q  I understand.
21  A  But I am a police -- an undercover
22  police officer.
23  Q  Do you sometimes call yourself police
24  decoys?

Page 143

1  A  I don't know what other people call
2  themselves.
3  Q  I'm asking you. Have you ever heard
4  that term?
5      Let's go back to the beginning
6  ground rules again.
7  A  No, I don't refer to myself as a
8  police decoy.
9  Q  Have you ever heard anybody refer to
10  an undercover officer as a decoy?
11  A  No.
12      Undercover cop. That's what I
13  mainly use.
14  Q  So this complaint is the first time
15  you've ever seen the word "decoy" used in this
16  type of situation?
17  A  Yes, it's the first time I've seen
18  it.
19  Q  If we substituted the word
20  "undercover" for the word "decoy", would that be
21  you who we're talking about?
22  MR. SELMER: Objecting. Foundation,
23  speculation.
24  THE WITNESS: A Is there a need to replace

Page 144

1  it?
2  MR. OGUS: Q That's not the question.
3  It's a hypothetical.
4      Since you never saw the word
5  "decoy", if we substitute that word with the word
6  "undercover" -- that's the word you've seen
7  before, right, "undercover"?
8  A  Yes.
9  Q  If we substitute the word
10  "undercover" for the word "decoy", would the word
11  "undercover" be referring to you as to the arrest
12  of Mr. Felder?
13  MR. SELMER: Objection. Foundation,
14  speculation.
15  THE WITNESS: A I...
16  MR. OGUS: Read it back, Nick.
17      Let the record show that I'm
18  only reading it back when there's a 10 or
19  15-second break between the question and nothing
20  being said.
21  MR. SELMER: I object to that
22  characterization.
23
24      (Question read.)