Page 193

1  correct? That's the first thing that occurs,
2  right.
3       MR. SELMER: Objection to the extent it
4  mischaracterizes her testimony.
5       THE WITNESS: A I can't recall verbatim.
6  But basically there's a conversation that occurs
7  where there's an agreement that I give him -- that
8  I perform oral sex --
9       MR. OGUS: Q I understand the agreement.
10      MR. SELMER: She's answering.
11      MR. OGUS: Q Are you still answering?
12      THE WITNESS: A That I perform oral sex,
13 and he agrees to it. I ask him for $10.
14   Q  Now we can do this the easy way or
15 the hard way again. I want to know what he said
16 to come to this agreement.
17      You walk up to his car on the
18 driver's side. Who speaks first?
19   A  I can't tell you who spoke first.
20 All I can say is in the conversation I offered to
21 give him a blow job.
22   Q  Okay.
23   A  I --
24   Q  Did he -- go ahead. I'm sorry.

Page 194

1   A  I offered to give him a blow job. He
2  agrees to accept that offer for me to perform a
3  blow job in the amount of $10, and he shows me the
4  money.
5   Q  Who is the first person who mentions
6  $10?
7   A  I am.
8   Q  Who's the first person who mentions
9  blow job?
10  A  I can't recall, but I know that I
11 said blow job.
12  Q  Okay. So you can't recall if he is
13 the first person who said it?
14  A  No, I can't.
15  Q  It's possible you were the first
16 person that means, right?
17  A  Can't recall.
18  Q  If you can't recall, it's possible
19 that you were first?
20  A  I know I said a blow job.
21  Q  Whatever you testified to earlier
22 that was the truth, correct? Whatever you
23 testified about, the conversation you had, the
24 solicitation -- do you remember that conversation

Page 195

1  we had about the definition of soliciting?
2   A  Yes.
3   Q  Whenever that conversation --
4  whenever you answered those questions before you
5  were telling me the truth? You were answering the
6  questions truthfully, right?
7   A  Yes.
8   Q  So did Mr. Felder solicit you for
9  sex?
10  A  Did he solicit me for sex?
11  Q  Yes.
12  A  Yes.
13  Q  How did he do that?
14  A  He agreed to me performing oral sex.
15  Q  Didn't you solicit him?
16  A  I'm sorry?
17  Q  Didn't you solicit him?
18  A  I put the offer out there.
19  Q  Okay. So you solicited him, correct?
20  A  I put the offer out there, yes.
21  Q  So you solicited him, yes?
22  A  I put the offer out there.
23  Q  I know what you did. I'm asking you
24 to tell me whether or not you consider that

Page 196

1  soliciting him.
2   A  Yes.
3   Q  Okay. That's fair.
4      He solicited you? Is that what
5  you're saying also?
6   A  Yes.
7   Q  Didn't you tell me under oath before
8  that the person who makes the offer is the person
9  who solicits and the person who makes the
10 agreement is not the solicitor?
11     Didn't you testify to that
12 before?
13     MR. SELMER: Objection to that question.
14 It mischaracterizes her testimony.
15     MR. OGUS: Q Didn't you testify to that
16 before?
17     THE WITNESS: A No, I did not testify to
18 that.
19  Q  So if the record says that, then you
20 made a mistake?
21  A  No.
22  Q  So what you said is correct?
23  A  No.
24  Q  Okay. As far as you understand, as

Page 197

1  far as you understand, it's proper and reasonable
2  and you have reasonable cause to arrest someone
3  when you offer to perform a sexual act for $10 and
4  the person agrees?
5      A   I offered to perform a sexual act.
6  He agreed to it. Like I said, it's not verbatim.
7      Q   I understand.
8      A   He said it himself. He agreed to it.
9  He said get in the car. He was going to give me
10 the $10. Those are all the elements of the
11 probable cause for the arrest.
12     Q   Can you read my question again.
13         You're explaining things. I
14 want a question answered. That is for him to ask
15 at trial. That's for something else. I ask
16 questions...
17     MR. SELMER: And she's giving you an
18 answer.
19     MR. OGUS: No, she's not.
20         Go back and read the question.
21
22     (Question read.)
23
24     MR. OGUS: It's a yes or a no.

Page 198

1      MR. SELMER: Unless you can't answer yes or
2  no.
3      MR. OGUS: Unless you don't know. It's a
4  yes, no, or I don't know.
5      MR. SELMER: No.
6      MR. OGUS: Read the question again.
7      THE WITNESS: Can you reread the question.
8
9      (Question read.)
10
11     THE WITNESS: A  When all the elements are
12 present, I offer, he agrees, he shows me the
13 money, those are grounds for an arrest.
14     MR. OGUS: Can you read the question again.
15         I want that question answered
16 yes, no, or I don't know.
17
18     (Question read.)
19
20     MR. OGUS: Q  If I asked you if today is
21 Thursday, it seems to me that the answers are,
22 yes, it's Thursday, or no, it's not Thursday, or I
23 don't know.
24         Are there any other answers?

Page 199

1      THE WITNESS: A  If you ask if today is
2  Thursday?
3      Q   Yes.
4      A   Then, yes, it's a yes or no question.
5      Q   Or I don't know, right?
6      A   I mean, you know...
7      Q   I'm asking you a simple question?
8      A   But that's not a yes or no question.
9      Q   Why isn't a yes or no question?
10     A   Because I'm telling you what were the
11 grounds for my arrest.
12     Q   But I don't want to know the grounds
13 for the arrest. You're answering a different
14 question.
15     A   I'm not answering it the way you
16 would like me to answer.
17     MR. OGUS: David, it's a very simple
18 question. I'm going to certify the question, and
19 I'm going to haul her back in again if you don't
20 explain to her that I need an answer to this
21 question.
22         We'll give it one more shot,
23 but I think the judge will see I've been extremely
24 reasonable.

Page 200

1          I don't want to know whether
2  whatever you said is your answer. That's not my
3  question, or whether or not you answered it, or
4  because you believe that's my question or that's
5  what you want to answer.
6          I'm going to have Nick read the
7  question back one more time, and at the end of the
8  question the answer should be yes, no, or I don't
9  know.
10         If you answer yes, we're
11 probably done. If you answer no, we're probably
12 done. And if you answer I don't know, I may have
13 another question. But you're the one prolonging
14 this by just answering the questions you feel you
15 need to answer.
16         So now let's go back and ask
17 the question.
18
19     (Question read.)
20
21     THE WITNESS: A  No, it is not. It
22 requires the sexual act and the money exchange.
23     Q   It doesn't...
24     A   Now based off your question you're

Page 201

1 just saying an offer.
2    Q  Read...
3    A  So therefore I can't answer it the
4 way you want me to answer it.
5    MR. OGUS:  I'm going to bring this to the
6 Court's attention.  I'm going to stop the
7 deposition.  This has been four hours of hide the
8 salami or something like that -- you know what,
9 I'm going to finish.
10       I'm going to finish.  And we'll
11 go to the judge later, and I'll get her back to
12 answer that question.  And I'll ask for my fees.
13       Let's go on.  Exhibit 3, notice
14 of vehicle impoundment.
15
16       (Document marked as requested.)
17
18    MR. OGUS: Q  Look at the bottom.  It's got
19 signature of issuing officer.  It looks to me like
20 it says C. Bady, 11453.
21       Do you see that?
22    THE WITNESS:  A  Yes.
23    Q  Did you sign that?
24    A  No.

Page 202

1    Q  Did you authorize anyone to sign your
2 name?
3    A  Yes.
4    Q  Who did you authorize?
5    A  I can't recall.
6    Q  Some member of your team?
7    A  Yes.
8    Q  Nobody else?
9    A  Nobody else.
10   Q  Do you know who signed it?
11   A  No.
12   Q  And the rest of the information here,
13 any of this, did you fill it out?
14   A  No.
15   Q  Did you authorize that same person to
16 do it?
17   A  I didn't authorize, but that person
18 knows what's involved.
19   Q  Do you know the -- it says here -- if
20 you look above your signature it says under
21 penalties as provided by law pursuant to section
22 1-109 of the Illinois Code of Civil Procedure, the
23 undersigned certifies that the statements set
24 forth in this instrument are true and correct.

Page 203

1       Do you see that?
2    A  Yes.
3    Q  Did you certify that the information
4 set forth was true and correct?
5    A  Yes.
6    Q  You did?
7    A  Yes.
8    Q  How did you do that?
9    A  By reviewing and approving it.
10   Q  You reviewed this before it was
11 signed?
12   A  I'm sorry?
13   Q  You reviewed this before it was
14 signed?
15   A  Yes.
16   Q  Who did you tell it was correct?
17   A  I can't recall who.
18   Q  Now let's look -- all this
19 information is correct according to you, right?
20   A  Yes.
21   Q  And so the vehicle towed from
22 address, do you see that, 2255 East 103rd Street?
23   A  Yes.
24   Q  If you go back to look at the arrest

Page 204

1 report, that talks about East 77th Street?  Do you
2 see that?
3    A  Yes.
4    Q  Do you know how the car got from East
5 77th Street to East 103rd Street?
6    A  It was driven.
7    Q  By who?
8    A  I don't know.
9    Q  How do you know it got to East 103rd
10 Street?
11   A  Based off the tow report.
12   Q  Is this the tow report?
13   A  Yes.
14   Q  How do you know?
15   A  I'm sorry.  The notice of vehicle
16 impoundment.
17   Q  How do you know the information is
18 correct?  Just because it's there it's correct?
19   A  Yes.
20   Q  So you have no independent knowledge
21 of any of the facts on this?
22   MR. SELMER:  Objection.  Mischaracterizes
23 her testimony.
24   THE WITNESS:  A  I have knowledge.

DIGIOVANNI REPORTING, P.C. (312) 345-6360

Page 201 - Page 204

Page 205

1   MR. OGUS: Q You have specific knowledge,
2   your own knowledge, that the car was towed from
3   2255...
4   A   No, I did not see it.
5   Q   I'll ask you to wait for my question.
6       Do you have your own knowledge
7   that the car was towed from 2255 East 103rd
8   Street?
9   A   I did not see the vehicle.
10  Q   You were told it was, right?
11  A   Yes.
12  Q   And you're relying on somebody else,
13  right?
14  A   Yes.
15  Q   And it also has got a court date on
16  there, 05 September '07. Do you see that?
17  A   Yes.
18  Q   And the day off group, one? Do you
19  see that? Is that a one?
20  A   Yes.
21  Q   Is that your day off group -- was
22  that your day off group?
23  A   Yes.
24  Q   And were you in court on September 5,

Page 206

1   '07?
2   A   Yes.
3   Q   What happened?
4   A   I was there to testify --
5   Q   What happened?
6   A   -- To the cases.
7   Q   Did this case go to trial?
8   A   I don't recall the case being
9   presented for trial.
10  Q   Did the case get continued?
11  A   No, it did not get continued.
12  Q   What happened to it that day?
13  A   According to the lawsuit it was
14  nonsuited.
15  Q   Were you there the day it was
16  nonsuited?
17  A   I was there September 5th.
18  Q   Did you speak to Mr. Felder that day
19  in court?
20  A   No, I didn't.
21  Q   Did he have an attorney?
22  A   I don't know.
23  Q   When the case was called did you go
24  up and talk to the judge?

Page 207

1   A   No.
2   Q   Did you go in front of the judge?
3   A   No.
4   Q   Had you talked to the State's
5   Attorney about the case?
6   A   No.
7   Q   Did the State's Attorney know you
8   were there?
9       MR. SELMER: Objection.
10      THE WITNESS: A I signed in.
11      MR. OGUS: Q So the case -- you had no
12  conversation with the State's Attorney as to what
13  was going to be happening with the case?
14  A   No.
15  Q   Were you there when the case was
16  dismissed?
17  A   No.
18  Q   You left?
19  A   Not that I recall. Not that I
20  recall.
21  Q   Had you left the courtroom?
22  A   Yes, I had left. Once everything --
23  once I testified I was dismissed.
24  Q   Did you testify as to Mr. Felder's

Page 208

1   case?
2   A   No.
3   Q   Okay. So you said once you testified
4   you left. You didn't testify?
5   A   I'm sorry. When I was done. There
6   was other cases.
7   Q   Okay.
8   A   Not only Mr. Felder. But there's
9   other cases. I testified and then left.
10  Q   But Mr. Felder's case was still going
11  on while you were still there, right?
12  A   If -- while I was there his case was
13  not called.
14  Q   So his case was either called before
15  you got there or after you got there?
16      MR. SELMER: Objection. Assumes facts not
17  in evidence.
18      MR. OGUS: Q Is there any other
19  possibility?
20      MR. SELMER: It was not called at all.
21      THE WITNESS: A It wasn't called.
22      MR. OGUS: Q You're saying it's either you
23  weren't there because you arrived before the case
24  was called or you left -- I'm sorry. The case was