# DiGiovanni Reporting, P.C.

## (312) 345-6360

DEPOSITION

of

Charlie Johnson

In the Case of
FELDER -v- CITY OF CHICAGO, et al.
07 C 6501

July 18, 2008

CONDENSED TRANSCRIPT
WORD INDEX

105 West Adams Street   Office: (312) 345-6360
Suite 2501   Cell: (312) 504-1420
Chicago, IL 60603   Fax: (312) 782-8377

Exhibit B(1)

## Page 1

```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION

ROBERT L. FELDER,           )
                            )
        Plaintiff,          )
                            )
   -vs-                     )    No. 07 C 6501
                            )
CITY OF CHICAGO;            )
C.S. JOHNSON (#16589);      )
C. BADY (#11453),           )
                            )
        Defendants.         )
```

The Deposition of CHARLIE JOHNSON taken before THOMAS A. MANNO, C.S.R. and Notary Public within and for the State of Illinois, pursuant to the provisions of the Federal Rules of Civil Procedure of the United States District Court, pertaining to the taking of depositions, taken at 39 South LaSalle Street, Suite 1400, Chicago, Illinois 60602, at the hour of approximately 1:00 o'clock p.m. on July 18th, 2008.

## Page 2

APPEARANCES:

LAW OFFICE OF LONNY BEN OGUS, By
Mr. Lonny Ben Ogus
39 South LaSalle Street
Chicago, Illinois 60602
Suite 1400
312-332-7374

   Appeared on behalf of the Plaintiff.

CORPORATION COUNSEL, By
Mr. David Selmer
30 North LaSalle Street
Chicago, Illinois 60602
Suite 1400
312-744-6905

   Appeared on behalf of the Defendants.

ALSO PRESENT:

Ms. Cherron Bady.

## Page 3

WITNESS:                                      PAGE:

Charlie Johnson

Examination by Mr. Ogus                          4
Examination by Mr. Selmer                       94
Further Examination by Mr. Ogus                 97

CERTIFIED QUESTION:

Page 88, Line 4

EXHIBITS:

*Bady Exhibit No. 3                             74
*Bady Exhibit No. 2                             75

*Exhibits not retained by the court reporter.

## Page 4

(Witness sworn.)

CHARLIE JOHNSON, being first duly sworn, was examined and testified as follows:

EXAMINATION
By MR. OGUS:

Q. Would you state your name and spell it for the record, please?

A. Charlie Johnson. C-H-A-R-L-I-E, J-O-H-N-S-O-N.

Q. Mr. Johnson, your star number is 16589?

A. That's correct.

Q. And you're a police officer for the City of Chicago?

A. That's correct.

Q. Have you ever had your deposition taken?

A. No.

Q. Have you ever testified in court?

A. Yes.

Q. I'm going to be asking you some questions, trying to find out what you know, what you don't know, what you remember, what you don't remember.

If you don't understand a question, just tell me. I'll try to get it so we're on the same wavelength.

If you don't tell me you don't understand, I'll

## Page 5

1  assume you do understand --
2  A.  Yes.
3  Q.  And also understand the second rule is, you
4  have to verbalize. You can't shrug your head, uh-huh or
5  anything like that. It's got to be yes, no, I don't
6  know, or the answer, okay?
7  A.  Yes.
8  Q.  Officer Johnson, how long have you been a
9  police officer?
10  A.  About five years going on six, in October.
11  Q.  What did you do before you were a police
12  officer?
13  A.  Student.
14  Q.  Where?
15  A.  DePaul.
16  Q.  And did you graduate?
17  A.  No.
18  Q.  Are you making plans to go back?
19  A.  Um-hum. Yes.
20  Q.  Are you still going?
21  A.  Yes. I just finished up school and something
22  else unrelated to the police department.
23  Q.  What's your major?
24  A.  Criminal Justice.

## Page 6

1  Q.  And before you became a police officer, did you
2  work?
3  A.  Yes.
4  Q.  What did you do before that?
5  A.  I worked for Northwestern Medical Faculty
6  Foundation.
7  Q.  What did you do there?
8  A.  I did medical billing, but when I left there, I
9  think I was still doing coding and billing, but I had
10  held a lot of positions there.
11  Q.  Coding and billing?
12  A.  Yes.
13  Q.  And how long did you work there?
14  A.  From the time I graduated from high school.
15  From 17 until about 21.
16  Q.  Four years?
17  A.  Yes.
18  Q.  So at 21, you--
19  A.  Joined the police department.
20  Q.  So you're about 26 now?
21  A.  Correct.
22  Q.  And your title is what, as a police officer?
23  A.  Police officer.
24  Q.  And what district do you work at?

## Page 7

1  A.  The 4th District.
2  Q.  Have you ever worked at any other district?
3  A.  No.
4  Q.  And when you first came out of the academy
5  about five years go, what were your duties?
6  A.  Five years ago it was just plain patrol.
7  Q.  And did that change?
8  A.  Yes.
9  Q.  And when did it change?
10  A.  Exact date I would say--
11  Q.  No, I don't need an exact date.
12  A.  Probably about two, two and a half years after
13  that.
14  Q.  And when they changed, what did they change to?
15  A.  Midnight Violence Suppression Team.
16  Q.  Which means what?
17  A.  Suppression of violence at night.
18  Q.  At midnight.
19  A.  Right.
20  Q.  All right. And how did you do that? What's
21  different about that than a patrol officer who's working
22  midnights?
23  A.  Okay. A patrol officer patrols and answers
24  calls.

## Page 8

1  We answer a lot of on view and hot calls, as
2  you may -- like if a man with a gun came out, or a
3  narcotic complaint. That would be like our mission.
4  It's to try to get to on-view shootings and
5  stuff like that right away to try to get them solved.
6  Q.  But a patrolman would also answer that call,
7  right, if that's his beat?
8  A.  Well, if a patrolman is taking calls -- they
9  take domestics or whatever. If they're on a call, then
10  they can't answer a hot call. We stay open just for hot
11  calls.
12  Q.  Gotcha. Okay.
13  And did your duties ever change from this
14  Midnight Suppression Team?
15  A.  Yes. We went to the tactical team.
16  Q.  And when did that occur?
17  A.  It occurred like four, five months after that.
18  Q.  And you've been there ever since?
19  A.  Yes. We've been there ever since, but we was
20  just recently detailed to narcotics.
21  Q.  Prior to your detailing to narcotics, where
22  were you detailed to?
23  A.  We was assigned to the 4th District.
24  Q.  So now you're not in the 4th District, you're

## Page 9

1  in a--
2  A. We're assigned, yeah. We're assigned to the
3  4th District.
4  Q. I'm sure I don't understand you. I'm sure you
5  know what you're talking about and I'm sure I don't.
6  A. Right.
7  Q. So just make to sure I get it straight.
8      You're still assigned to the 4th District now?
9  A. Yes. I'm working in the 4th District now.
10 Q. But you're not assigned to the 4th District?
11 Is there a difference? I don't know. I'm asking you.
12 A. You asked me, am I assigned to the 4th
13 District.
14 Q. Yes.
15 A. And I told you I was assigned to the 4th
16 District.
17 Q. Okay.
18 A. Now you're saying I'm not assigned to the 4th
19 District.
20 Q. No, that's not what I said.
21 A. Okay.
22 Q. I thought you said you were assigned to
23 narcotics--
24 A. Detailed.

## Page 10

1  Q. --within the 4th District?
2  A. Yes.
3  Q. Okay. And before being assigned to narcotics
4  within the 4th District--
5  A. Detailed.
6  Q. Before being detailed to the Narcotics Section
7  of the 4th District, where were you detailed?
8  A. To the 4th District.
9  Q. What section? Was there a different section,
10 other than narcotics?
11 A. No.
12 Q. So you just had general duties?
13 A. Missions.
14 Q. Let me go back again.
15     At some point you were on the midnight
16 suppression detail, right?
17 A. Try not to confuse yourself now. This seems
18 complicated.
19 Q. I've done a real good job.
20 A. Right. Let's iron this out for you. So what's
21 your question?
22 Q. The question is, were you on the midnight
23 suppression detail?
24 A. No.

## Page 11

1  Q. I've used the word "detail" incorrectly then,
2  right?
3  A. Right.
4  Q. Midnight suppression what?
5  A. Team.
6  Q. Team. Okay.
7     And where do you go from the Midnight
8  Suppression Team?
9  A. To the tactical team.
10 Q. And from the tactical team you've now gone to
11 the narcotics detail?
12 A. Detail, right.
13     MR. SELMER: So he's still assigned to the
14 tactical team, but he's detailed out as part of that
15 tactical team working in narcotics.
16     MR. OGUS: Q. Okay. Is that correct?
17 A. That's correct.
18 Q. Before you were assigned as part of the
19 tactical team to narcotics, were you assigned to a
20 different detail within the 4th District tactical group?
21 A. Rephrase the question.
22 Q. Now you're assigned to the 4th District
23 tactical team, narcotics?
24 A. No. Tactical team.

## Page 12

1     I'm assigned to 4th District tac, tactical
2  team. I'm assigned to the 4th District tactical team.
3  Q. Okay.
4  A. Assigned.
5  Q. But you're detailed to--
6  A. No. We're still assigned to the 4th District.
7  We're not detailed nowhere right now.
8     You were asking me what different things that
9  we do. I was telling you just recently we came back to
10 the 4th District tactical team.
11 Q. Recently you came back, you say within the last
12 four or five months, right?
13 A. No. Within the last two days.
14 Q. Prior to two days ago, what were you doing?
15 A. Just Area 2 narcotics.
16 Q. And at some point you were in the 4th District
17 tactical team, detailed or assigned to prostitution
18 arrests; is that fair to say?
19 A. No.
20 Q. You did work prostitution reverse stings,
21 correct?
22 A. Yes, we did.
23 Q. But you didn't do that exclusively every day
24 for a period of time?

###### Page 13

1  A. No. It was operations given.
2  Q. And over what period of time, over how many
3  months or years did you work -- strike that. Let me ask
4  it a different way.
5  From the first day you worked on an operation
6  sting with prostitution until the last day you worked on
7  it, how much time is there in between -- a year, six
8  months, two years?
9  A. From the first time to the second time?
10 Q. First time to the last time. First to last.
11 A. I've only worked one.
12 Q. Only worked one day?
13 A. Yes.
14 Q. One time, prostitution detail?
15 A. Yes.
16 Q. And that was the night my client was arrested?
17 A. That's correct.
18 Q. And I take it that's the only night you worked
19 with Officer Bady?
20 A. No.
21 Q. That's the only night you worked with
22 Officer Bady in the prostitution unit as part of a
23 prostitution search?
24 A. That was the first time we did a prostitution.

###### Page 14

1  Q. And that's the only time you worked with her as
2  part of a prostitution arrest?
3  A. That's correct.
4  MR. SELMER: You have to wait for him to finish
5  his question.
6  MR. OGUS: Q. And just so I get it correct, make
7  sure I understand it, you haven't worked with any other
8  officers, female or male, in prostitution arrest stings?
9  A. No.
10 Q. Now, prior to you working this -- should we
11 call it a reverse sting? Is that what you call it?
12 A. Yes. Operation Angel, reverse sting.
13 Q. Just to make sure again, the one night where
14 Mr. Felder was arrested, that's the only night you worked
15 in Operation Angel?
16 A. That's correct.
17 Q. Did you know Officer Bady before that night?
18 A. Yes.
19 Q. Had you worked with her before?
20 A. Yes. She's my regular partner.
21 Q. And is she still your regular partner?
22 A. Yes.
23 Q. And when you were assigned to Operation Angel,
24 did you get any training as to what you should do, what

###### Page 15

1  the rules were, what the policies were?
2  MR. SELMER: Objection, vague.
3  THE WITNESS: I mean, they gave like a -- I
4  mean we worked on that particular beat on that street,
5  where we get a lot of prostitution complaints from the
6  community beat meetings. So we kind of know what's going
7  on over there.
8  So I mean, just knowledge of that beat and
9  making prostitution arrests, that's part -- that's where
10 we receive -- most of our training is on hand.
11 MR. OGUS: Q. When you say you've made prostitution
12 arrests, other than that night and before that night,
13 you're talking -- you weren't working undercover?
14 A. No.
15 Q. There was no sting operation?
16 A. No.
17 Q. So somebody would call and say they saw
18 something, and you'd go down and look at it?
19 Or how would you make a prostitution arrest
20 without being in Operation Angel?
21 A. It depends. We really -- I've never really
22 just made just a plain prostitution. I mean we've caught
23 people having sex.
24 Q. Okay.

###### Page 16

1  A. Impeding the flow of traffic out on the street,
2  you know, pointing at their mouth, making sexual gestures
3  that they're selling their body or whatever.
4  So we made prostitution arrests in relation to
5  what was going on at the time.
6  Q. So if somebody made some gesture which you
7  believe was an offer for sex for money, you would arrest
8  them for that?
9  MR. SELMER: Objection, incomplete
10 hypothetical, foundation.
11 THE WITNESS: It depends.
12 MR. OGUS: Q. Okay. But you could. Let me strike
13 that. You have done those things?
14 A. I've arrested people on elements that I thought
15 was of some sexual gesture for money.
16 Q. Okay. But now that you're on this Operation
17 Angel, it's a different operation.
18 You're now setting up as decoy, and you're the
19 back-up, correct, or you're the watcher?
20 A. Enforcement.
21 Q. So did you get any training as to what you
22 could do or say to people driving down the street before
23 you arrested them?
24 MR. SELMER: Objection, form, vague.