**Page 69**

Q. You're not wearing a jacket of any sort, you're just wearing your shirt?
A. That's correct.
Q. So you told him to get out of the car. He sat there, as you put it, with a $10 bill in one hand -- a $10 bill and wallet in his hands. What happens then?
A. Since he wasn't responding to the order, he was taken out of the vehicle.
Q. Who took him out?
A. I believe me and another officer.
Q. Who is that other officer?
A. I don't remember.
Q. One of the team?
A. One of the team.
Q. And where did that officer -- did that officer come from the driver's side, the passenger's side?
A. I don't remember.
Q. Why didn't you take him out by yourself?
A. Well, it's procedure. I mean, I really didn't know if he was armed or anything.
So usually I'm posing as a cover officer just in case he pulls out a gun or any type of weapon. I'm covering him.
And then someone else usually puts their hand

**Page 70**

on the person while I'm covering him.
Q. When you say cover officer, that means you're now protecting the person who's going to do the--
A. Take-down, right.
Q. And when you cover someone, you have your gun out pointed at the person you're covering for?
A. Well, pointed at the subject.
If the person that you're covering for crosses in front of your weapon, you hold your weapon down.
Q. Gotcha.
So while this other officer is pulling Mr. Felder out of the car, your weapon is pointed at Mr. Felder?
A. Before the officer arrives.
When the officer arrives, the weapon goes to the holster, and I help the officer remove the subject from the vehicle.
Q. And what happens when you remove the subject from the vehicle?
A. He's placed into custody.
Q. Who did that? How do you do that?
A. Just put the handcuffs on him and, you know, inform him of what he's being arrested for.
Q. That's right at the car, right at the scene?

**Page 71**

A. Right there.
Q. And who puts the handcuffs on Mr. Felder?
A. That I don't remember.
Q. And you don't remember the names of the person who came up with you?
A. Just one of my teammates. I really don't remember.
Q. He was handcuffed behind his back, right?
A. Correct.
Q. And what happens after he's handcuffed behind his back?
A. After he was handcuffed, I believe he was taken to the location where the squadrol was. I don't remember.
I think someone did come and get him and take him to the squadrol.
Q. They put him in a car?
A. Put him a car; yes, right.
Q. Did do you that?
A. No.
Q. So Mr. Felder is placed into -- being placed in the squad car, right?
A. Correct.
Q. And before Mr. Felder is placed in the squad

**Page 72**

car, Officer Bady comes back?
A. No.
Q. So does Officer Bady ever come back while Mr. Felder is still there?
A. Not that I recall, no.
Q. And you don't drive Mr. Felder to the squadrol?
A. No, sir.
Q. Do you ever see him again?
A. Yes.
Q. When was that?
A. In the lock-up.
Q. Do you have a conversation with him then?
A. No. I just asked him his pertinent information and verified his ID and everything like that.
Q. Nothing about the incident?
A. Nothing.
Q. He didn't say anything about why, what am I doing here, what's going on?
A. No.
Q. He just gave you his name, address, and that kind of stuff, right?
A. Correct.
Q. Did you ever see him again after that?
A. No.

### Page 73

1  Q. Did you ever go to Criminal Court to testify in
2  this case?
3  A. No.
4  Q. Were you ever notified to go to Criminal Court?
5  A. No.
6  Q. You knew there was going to be a criminal case,
7  right?
8  A. Yes.
9  Q. Do you ever go to -- strike that.
10     As to the people that were arrested that night
11 as part of Operation Angel, did you go to court on any of
12 them?
13 A. No, sir.
14 Q. Do you know if anybody who you arrested that
15 night was convicted of any crime?
16 A. I don't know.
17 Q. Do you know when Mr. Felder was released from
18 jail?
19 A. I don't know.
20 Q. You don't know how many times he went to court,
21 right?
22 A. No.
23 Q. Do you know what happened to his car?
24 A. It was impounded.

### Page 74

1  Q. Did you do that?
2  A. No. I don't recall.
3  Q. Did you ever go to the administrative hearing
4  about the impounding of the car?
5  A. No.
6  Q. We don't need to mark it again. I just want to
7  show it to you.
8     This is the what appears to be me to be the
9  misdemeanor ordinance violation.
10    (Document tendered to the witness.)
11    Do you see that?
12 A. Yes.
13 Q. Is anything on that piece of paper in your
14 handwriting or printing?
15 A. No, sir.
16 Q. Do you know who did any of the handwriting or
17 printing?
18 A. No, sir.
19 Q. Do you know who did any of the typing?
20 A. No.
21 Q. This has been marked also. I don't need to
22 re-mark it. I'll just note it was Exhibit 3 at Bady's,
23 notice of vehicle impoundment.
24    (Document tendered to the witness.)

### Page 75

1     Is anything on that form in your writing,
2  printing, or anything like that?
3  A. No, sir.
4  Q. Do you know anybody--
5  A. No, sir.
6  Q. You don't know who printed or wrote any of
7  that--
8  A. No.
9  Q. --information, right?
10 A. No.
11    MR. SELMER: Wait until he finishes the
12 question before you answer.
13    THE WITNESS: Okay.
14    (Document tendered to the witness.)
15 MR. OGUS: Q. And this was marked as Bady
16 Exhibit 2, the arrest report.
17 A. Um-hum.
18 Q. Do you see that?
19 A. Right.
20 Q. Did you fill out any reports?
21 A. I don't recall.
22 Q. Look at Page 3 of Page 5.
23    You are the attesting officer. Do you see
24 that?

### Page 76

1  A. Yes.
2  Q. And you are also the second arresting officer?
3  A. Yes.
4  Q. And you are also the officer who approved the
5  probable cause. Do you see that?
6  A. Yes.
7  Q. Did you approve the probable cause in this
8  case?
9  A. No.
10 Q. Do you know who put your name there?
11 A. I did.
12 Q. Well, it says, approval of probable cause,
13 R. Johnson. Do you see that?
14    Does that mean that you were approving that
15 there was probable cause in this case?
16 A. I'm C. Johnson. This is R.
17 Q. Oh, I'm sorry. I didn't even notice that.
18 Okay. Who's R. Johnson?
19 A. I don't know.
20    (Brief pause.)
21    Wait, wait, wait. That's Robert. That's
22 Lieutenant Robert Johnson.
23 Q. I didn't even see that.
24    Let me show you the arrestee processing

77

1 personnel.
2 (Document tendered to the witness.)
3 Do you see those?
4  A. Yes.
5  Q. Which of those people were part of your team
6 that night?
7  A. Part of my team would be Otten, O-T-T-E-N; Ray,
8 R-A-Y; Passamentt, P-A-S-S-A-M-E-N-T-T; and Harris,
9 H-A-R-R-I-S.
10  Q. The other two were not -- the two listed above
11 them?
12  A. Three is not.
13  Q. The top two and the bottom one on that list are
14 not, correct?
15  A. That's correct.
16  Q. Now that you're looking at the names of Otten,
17 Ray, Passamentt, and Harris, does that refresh your
18 memory to which one helped you arrest -- take Mr. Felder
19 out of the car?
20  A. No.
21  Q. Was it only that one person who helped you take
22 Mr. Felder out of the car?
23  A. I believe so.
24  Q. Can you describe the gun you pointed at

78

1 Mr. Felder?
2  A. A nine millimeter.
3  Q. Is that standard issue?
4  A. Yes.
5  Q. The other officer who helped you, did he drive
6 up in a car or did he walk up, do you know?
7  MR. SELMER: Objection, asked and answered.
8  THE WITNESS: I don't recall.
9  MR. OGUS: Q. Did you ever have a conversation with
10 Officer Bady about what happened that night?
11  MR. SELMER: I'm going to object to this
12 extent.
13  He's referring to the attorney-client
14 conversations, but aside from that, you can answer.
15  MR. OGUS: Q. Any conversation you've had with
16 Officer Bady where your attorney was not present.
17  A. In relation to this case?
18  Q. Yes.
19  A. Yes. She told us what happened. Well, the
20 conversation wasn't directly to me. It was to the team.
21  Q. And when did that conversation take place?
22  A. When we got back to the station.
23  Q. Oh, okay. All right. And what did she tell
24 you happened?

79

1  A. That he solicited her.
2  Q. When she told you that he solicited her, did
3 she tell you that she was the first one to mention the
4 act of oral sex?
5  A. I don't recall.
6  Q. Did she tell you that she was the first one who
7 mentioned money?
8  A. I don't recall.
9  Q. As far as you know, the fact that she was the
10 first one who mentioned the act, the sexual act and the
11 money, does that still make it a crime, as far as you
12 know?
13  MR. SELMER: Objection, assumes facts not in
14 evidence. You can answer.
15  THE WITNESS: Wait. Ask it again.
16  MR. OGUS: Sure. I'll ask it again.
17  MR. OGUS: Q. If Officer Bady said to Mr. Felder,
18 will you give me $20 or -- will you give me $10 for a
19 blow job, would that be a crime if Mr. Felder said, yes?
20  MR. SELMER: Objection, incomplete
21 hypothetical. Calls for speculation. Foundation.
22  THE WITNESS: Right. I mean, I wouldn't -- it
23 would have to depend on that case.
24  MR. OGUS: Q. Okay. Well, the situation is that

80

1 Mr. Felder is sitting in his car, okay? And Officer Bady
2 goes over to him and says, I would like you to give me
3 $10 for a blow job, okay? That's the hypothetical, okay?
4 And Mr. Felder says, yes. That's the
5 hypothetical.
6 Has Mr. Felder, as you understand it, as you're
7 trained as a police officer -- has he solicited a
8 prostitute?
9  MR. SELMER: Objection, incomplete
10 hypothetical. Calls for speculation. Foundation.
11  THE WITNESS: If he does the act.
12  MR. OGUS: Q. The act means saying yes?
13  A. That he receives the blow job.
14  Q. No, no. He doesn't receive it. Let me ask it
15 again.
16 The hypothetical is, Mr. Felder is in his car.
17 Officer Bady, or any police officer, but Officer Bady
18 comes over to him and says, give me $10 and I will give
19 you a blow job. He says, yes.
20 Before the actual blow job takes place, has he
21 committed a crime? Has he solicited a prostitute, as far
22 as you understand from your training as a police officer?
23  MR. SELMER: Objection, incomplete
24 hypothetical, calls for speculation, lacks foundation.

## Page 81

1  THE WITNESS: So are you giving me the case?
2  MR. OGUS: Q. Yes. What I just -- forget about
3  what may have happened really, okay?
4  A. Okay.
5  Q. Just focus on what I said happened. Make
6  believe. Hypothetical, okay? Make believe.
7  Mr. Felder, or any person, stops his car.
8  Officer Bady goes over to that person and says, give me
9  $10 and I'll give you a blow job. That's the first thing
10  that occurs when the person stops. The first
11  conversation is, Officer Bady says, give me $10 and I
12  will give you a blow job. And the person in the car
13  says, okay.
14  Has the person in the car committed a crime of
15  solicitation of a prostitute?
16  MR. SELMER: Incomplete hypothetical, calls for
17  speculation, and assumes facts not in evidence, as well
18  as foundation.
19  MR. OGUS: It's a hypothetical. It can't lack
20  evidence because it's a hypothetical, okay?
21  Now you can answer the question.
22  MR. SELMER: Incomplete hypothetical. Same
23  objection.
24  MR. OGUS: It's my hypothetical. It can't be

## Page 82

1  incomplete.
2  If you want to add your facts to it as to
3  whether it's raining or whatever, that's your
4  hypothetical. My hypothetical is complete when I stop
5  talking. That was my complete hypothetical. Go ahead.
6  MR. SELMER: Same objection.
7  MR. OGUS: Good.
8  MR. OGUS: Q. Now you can answer it.
9  A. Is that the totality of all of the--
10  Q. Yes.
11  A. --all the circumstances?
12  Q. Yes.
13  MR. SELMER: Same objections.
14  THE WITNESS: I mean, hypothetically answering,
15  I guess -- I mean, I wouldn't know, really.
16  MR. OGUS: Q. You wouldn't know?
17  A. No.
18  Q. Okay. You're a police officer and you wouldn't
19  know if that's a crime?
20  MR. SELMER: Objection, asked and answered.
21  THE WITNESS: It depends on the circumstances.
22  MR. OGUS: I just gave you the circumstances.
23  MR. OGUS: Q. So if the officer is the first -- my
24  question really is -- I'll limit it even more.

## Page 83

1  If the police officer is the first and only one
2  who mentions sex and money, has the person who says yes
3  committed a crime?
4  MR. SELMER: Objection, incomplete
5  hypothetical, calls for speculation, lacks foundation.
6  THE WITNESS: I mean there's just -- there's no
7  right way to answer that. I mean--
8  MR. OGUS: Yes there is.
9  THE WITNESS: It's different, the totality of
10  the circumstances--
11  MR. SELMER: He's answered it.
12  THE WITNESS: --that, I wouldn't be able to
13  give you a direct answer to that because it would depend
14  on the totality of the circumstances involved in any
15  case.
16  You're just giving me a scenario, but you're
17  asking me to answer, give you a general answer to it,
18  which is--
19  MR. OGUS: Q. I'm not asking you to give me a
20  general answer. I'm asking you to give me a specific
21  answer to my specific question.
22  But if you can't answer that question for some
23  reason -- is that what you're saying? You can't answer
24  my question? You don't know the answer to my question?

## Page 84

1  A. I've given you my answer. That's the answer
2  that I have.
3  MR. SELMER: Objection, asked and answered.
4  THE WITNESS: Right. That's the answer that I
5  have. So that's my answer.
6  MR. OGUS: And I just want to make sure I
7  understand your answer so it doesn't change somewhere
8  down the line.
9  THE WITNESS: Okay.
10  MR. OGUS: Q. Your answer is, you don't know the
11  answer to my hypothetical, right?
12  A. That's not my answer.
13  Q. What is your answer?
14  THE WITNESS: Could you read it back?
15  MR. OGUS: Sure. Read back his answer.
16  (WHEREUPON, the record was read back as
17  requested.)
18  MR. OGUS: Q. Let's go back. Is that your answer,
19  I wouldn't know, to my question?
20  Read the second answer, because I have to know
21  which one it is.
22  THE WITNESS: The last answer I answered.
23  (WHEREUPON, the record was read as
24  requested.)